### Anthony MATTHEWS and Anne Matthews Plaintiffs,

v.

### UNITED STATES of America, Ken's Marine Service, Inc., Ken's Marine & Oil Service, T/B "Nathan Berman," her engines, tackle etc., in rem and Marine Movements, Inc., Defendants.

### Ken's Marine Service Inc. and Ken's Marine & Oil Service, Defendants and Third Party Plaintiffs,

v.

### Independent Testing and Consultation, Inc. Third Party Defendant.

### No. 95 CV 1142(CBA).

United States District Court, E.D. New York.

Feb. 28, 2001.

---

Cornelius A. Mahoney, Mahoney & Keane, NY, for Anthony Matthews, Anne Matthews.

Janis G Schulmeisters, United States Attorney's Office, Torts Branch, Civil Division, U.S. Dept. of Justice, Joseph E. Donat, Herzfeld & Rubin, P.C., New York City, for United States of America, Ken's Marine Service, Inc., Ken's Marine & Oil Service.

James J. McQuaid, Langan & Levy, New York City, for Independent Testing & Consultation, Inc.

## MEMORANDUM AND ORDER

AMON, District Judge.

In this action, plaintiffs Anthony Matthews and Anne Matthews seek damages related to personal injuries sustained by Anthony Matthews when he fell into an open holding tank on the barge "Nathan Berman." The Court has received the Report and Recommendation ("R & R") of the Honorable Marilyn Dolan Go, United States Magistrate Judge, dated July 24,

2000, which recommends that this Court grant defendant United States of America's ("United States" or the "government") and third-party defendant Independent Testing and Consultation, Inc.'s ("Independent Testing") motions for summary judgment.[1] The parties were given until August 11, 2000 to file any objections to the R & R, and each party submitted papers to the Court.

Defendants and third-party plaintiffs Ken's Marine Service, Inc. and Ken's Marine & Oil Service (collectively "KMS" or the "KMS defendants") object to the R & R because it: (1) improperly resolved disputed questions of fact against them; (2) incorrectly applied to this case the reasoning in *Claudio v. United States*, 94 CV 5220, 1996 WL 449329 (E.D.N.Y. July 31, 1996), regarding the "discretionary function exception"; (3) incorrectly applied the controlling law regarding the United States' liability to the KMS defendants under the Good Samaritan doctrine; and (4) incorrectly applied the controlling law regarding indemnity and contribution to KMS' claim against Independent Testing.[2] Plaintiffs Anthony and Anne Matthews filed objections concurring with KMS' objections with respect to the United States' motion for summary judgment, and addi-

tionally objected to the R & R to the extent that it suggests that the KMS defendants might not be strictly liable to plaintiffs under New York labor law.

Having reviewed the parties' objections, and conducted a *de novo* review of the record as to the portions of the R & R that the parties object to, the Court hereby adopts the R & R as the opinion of the Court, except to the extent clarified by this Order. *See* 28 U.S.C. § 636(b)(1). As a number of objections have been raised that merit more detailed discussion, the Court will address each in turn.

*Discussion*

### I. Disputed Facts

■ Although the KMS defendants' objections to the R & R are not entirely clear,[3] the Court understands KMS to first object to the R & R because it improperly resolves in the government's favor the disputed fact that U.S. Coast Guard Petty Officer Michael Puma, who had been assigned to oversee the KMS defendants' clean-up operations on the Nathan Berman on the night of October 1, 1993, did not act as a "safety watchman" on the gangway of the barge after Edward Claudio, a KMS

---

1. The United States moved to dismiss, or in the alternative, for summary judgment. As the Magistrate Judge considered evidence outside the pleadings, she properly treated the motion as a motion for summary judgment.

2. The KMS defendants' fifth objection is that the "exorbitant delay (over three years) taken by the Magistrate Judge in issuing the Report and Recommendation to this Court seriously prejudiced the rights of Ken's Marine who will now be potentially subjected to a significant award of pre-judgment interest ... for the period of time these motions were sub judice." (KMS Defs.' Objections at 3.) As this objection does not address the substance of the R & R, it will not be addressed.

3. The KMS defendants' objections to "facts" allegedly resolved against them are particu-

larly muddled. Although KMS lists seven allegedly disputed issues of fact that the Magistrate Judge improperly resolved in ruling on the instant motions, the majority of them are actually objections to legal determinations, well within a court's province on a summary judgment motion. From what the Court can discern, there are really only two facts that KMS alleges the Magistrate Judge resolved against them in ruling on the instant motions: (1) that U.S. Coast Guard Petty Officer Michael Puma was not serving as a safety watchman on the barge's gangway; and (2) that plaintiff Anthony Matthews had not yet begun performing the duties for which he was hired when he fell into the open holding tank. (KMS Defs.' Objections at 5–6, ¶¶ A, G.)

employee, had fallen into an open holding tank on the barge.[4] After a careful review of the evidence presented, the Court finds that the Magistrate Judge did not improperly resolve this issue of fact against the non-moving parties.

Plaintiffs and the KMS defendants fail to "set forth specific facts showing there is a genuine issue for trial," as is required to defeat a motion for summary judgment. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted) (No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."). According to Officer Puma, after Claudio fell into the tank, KMS' foreman Charles Loucka left the barge to contact the appropriate emergency services, and he followed Loucka off the barge and onto the pier "to make sure the proper calls were being made." (Deposition of Michael Puma ("Puma Dep.") at 21, 26–28.) In opposition, plaintiffs allege that Officer Puma had instead volunteered to serve as a "watchman" on the gangway to ensure that no one else would fall into the holding tank. (Plaintiff's Statement Pursuant to Rule 3(g) ¶ 8.) Likewise, the KMS defendants assert that Officer Puma "either affirmatively acted, or failed to properly act, as a safety officer." (KMS Defs.' Objections at 7.)

Neither plaintiffs nor the KMS defendants, however, offer sufficient evidence so that a reasonable trier of fact could find in their favor. The only evidence cited by plaintiffs in support of their allegation was the deposition testimony of Kevin Nugent, KMS' Site Safety Officer, who said that Loucka had told him that Officer Puma was standing on the gangway as a watchman to block access to the barge. The Magistrate Judge properly declined to credit this testimony as inadmissible hearsay. The KMS defendants, for their part, refer the Court only to their attorney's affidavit in opposition to the government's summary judgment motion, which does not cite any evidence in the record to support their contention that Puma was acting as a guard to prevent others from coming on board the barge. These unsubstantiated allegations by defendants and their attorney are also not sufficient to create a genuine issue of material fact.

Giving the non-moving parties the benefit of the doubt, the Magistrate Judge even considered Loucka's deposition testimony, which neither plaintiffs nor KMS referred to in their statements of disputed material facts or in their objections. Loucka, the only witness who claims to have observed Puma's actions after Claudio fell into the holding tank, testified that the last time he saw Puma before exiting the barge, Puma was "on the barge at the head of the gangway.... He was, to my understanding there as some sort of security to prevent other people from coming up on the barge." (Deposition of Charles Loucka ("Loucka Dep.") at 35–36.)

No reasonable trier of fact could find that Puma was in fact guarding the gangway on the basis of this testimony; Loucka's personal understanding of what Puma was doing is not significantly probative, particularly since Loucka testified that he

---

4. The uncontested fact that Officer Puma acted as a "safety watchman" observing KMS' Foreman Charles Loucka and another KMS employee, Ray Schoentube, while they conducted swipe tests on the barge's tanks to check for hazardous waste, R & R at 8, has no bearing on whether or not Officer Puma subsequently acted as a guard on the gangway after Claudio fell into the tank.

never instructed Puma to stand guard on the gangway, and indeed never spoke to him at all after Claudio's accident. To the contrary, Loucka testified that when he saw Puma at the top of the gangway, "I diverted, and I just kept heading towards the trailer" on the pier. (Louka Dep. at 49.) The Magistrate Judge therefore did not improperly resolve an a disputed material fact in the government's favor.

## II. *The Discretionary Function Exception*

The KMS defendants next object to the R & R because it improperly applied the "discretionary function exception" to find that the Court has no subject matter jurisdiction in this case.

■ As a general matter, "absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *Dorking Genetics v. United States*, 76 F.3d 1261, 1263 (2d Cir.1996). The Suits in Admiralty Act ("SAA"), 46 U.S.C.App. §§ 741–752, under which the instant action was brought, waives the United States' sovereign immunity, however, with respect to claims that "if a private person or property were involved, a proceeding in admiralty could be maintained." 46 U.S.C.App. §§ 742.

■ Although the SAA, unlike the Federal Tort Claims Act, 28 U.S.C. § 2680(a), does not contain an express discretionary function exception, the Second Circuit has held that the exception applies equally to the SAA. *See In re Joint Eastern and Southern Districts Asbestos Litig.*, 891 F.2d 31, 34–35 (2d Cir.1989). The discretionary function exception "insulates the Government from liability if the action challenged ... involves the permissible exercise of policy judgment." *Id.* at 36 (quoting *Berkovitz v. United States*, 486

U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). In considering whether the exception applies, the Court is to consider whether the conduct is a product of choice, and whether the choice involves considerations of public policy. *Id.*

■ The KMS defendants do not contest that the United States was performing a discretionary function in monitoring the clean-up activities being conducted on the Nathan Berman prior to, and at the time of, Claudio's accident. (KMS Defs.' Objections at 7.) As they point out, United States District Judge Leo I. Glasser made that exact determination in *Claudio v. United States*, No. 94 CV 5220, 1996 WL 449329, at *8 (E.D.N.Y. July 31, 1996), the action that arose out of Claudio's fall, and held that all claims against the United States were barred by the discretionary function exception. Rather, the KMS defendants contend that the discretionary function exception is inapplicable in the instant case because the circumstances of Matthews' accident, and the government's role in particular, differed from Claudio's accident.

This argument, while logically sound, is unavailing here since the Magistrate Judge properly found that there was no evidence to support the suggestion that Officer Puma volunteered to guard the gangway after Claudio fell into the holding tank. Accordingly, as Officer Puma did not accept any new responsibility for safety on the barge after Claudio's accident, the United States' position with respect to Matthews is no different from its position with respect to Claudio. The government had expressly delegated the responsibility for maintaining safety on the barge to a private contractor, KMS, in the Basic Ordering Agreement ("BOA") entered into by the parties. (*See* Declaration of Edward F. Kenny, dated Apr. 30, 1997, Ex. H

§ H.6.) Officer Puma was merely performing an oversight role on the barge, monitoring KMS' work, at the time the accident occurred. Such conduct is within the discretionary function exception to the SAA. *See, e.g., Andrews v. United States,* 121 F.3d 1430, 1440–41 (11th Cir.1997) (government cannot be sued for decision to delegate safety responsibilities to independent contractor or for decisions about how and how much to supervise the safety procedures of independent contractors); *Blaber v. United States,* 332 F.2d 629, 631 (2d Cir.1964) (in deciding "the extent to which it will undertake to supervise the safety procedures of private contractors, [the government] is exercising discretion at one of the highest planning level").[5]

■ To be sure, as the R & R implicitly recognized, if there had been sufficient probative evidence that Officer Puma had, in fact, undertaken to guard the gangway, then the KMS defendants' objections would be well-founded. The discretionary function exception does not protect the government in instances where it undertakes to perform an act necessary for another's safety and then acts negligently, even if it is within the government's discretion whether to act in the first place. Thus, in *Indian Towing Co. v. United States,* the Supreme Court held that the Coast Guard could be held liable for negligently maintaining a lighthouse that it had agreed to operate:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *see also Berkovitz,* 486 U.S. at 538 n. 3, 108 S.Ct. 1954 (noting that *Indian Towing* limited the scope of the discretionary function exception). Similarly, the Second Circuit held in *Eklof Marine Corp. v. United States,* 762 F.2d 200, 202–03 (2d Cir.1985), that once the Coast Guard acted to mark obstructions and maritime dangers in the Hudson River with buoys, the discretionary function exception would not bar a suit against the government if it did not do so reasonably and with due care. *See also Figueroa v. Department of the Army,* 695 F.Supp. 85, 88 (E.D.N.Y.1988); *cf. Albinder v. United States,* 703 F.Supp. 246, 247–48 (S.D.N.Y.1987) (if Coast Guard undertakes to rescue someone, it may be held liable for acting unreasonably); *Kurowsky v. United States,* 660 F.Supp. 442, 450 (S.D.N.Y.1986) (same).

Had there been evidence, therefore, that Officer Puma had affirmatively accepted the responsibility to ensure the safety of the public by acting as a guard on the gangway, then the discretionary exception function might not bar the instant action under the SAA. Since the Magistrate

---

**5.** *See also Moody v. United States,* 753 F.Supp. 1042, 1051–56 (N.D.N.Y.1990) (considering contract clause containing almost identical language as the BOA and holding discretionary function exception applies to government's decision to contractually designate its responsibility for safety to a general contractor and its actions activities in overseeing the contractor's work); *Doud v. United States,* 797 F.Supp. 138, 144–46 (N.D.N.Y.1992) (same); *Kandarge v. United States Dept. of the Navy,* 849 F.Supp. 304, 309 (D.N.J.1994) (same).

Judge properly concluded, however, that there was insufficient evidence that Puma was in fact standing watch on the gangway subsequent to Claudio's accident, the application of the discretionary function exception to preclude any claims against the United States in this suit is sound.

### III. *The Good Samaritan Doctrine*

The KMS defendants also apparently object to the R & R's conclusion that even if Petty Officer Puma had assumed a duty to act as a watchman on the gangway and the discretionary exception function did not apply, the United States could still not be held liable for negligence under the Good Samaritan doctrine. (KMS Defs.' Objections at 6, ¶ C.)

 As noted, the SAA does not create a new private right of action against the government, it merely waives sovereign immunity in cases where an admiralty action could otherwise be brought against a private party. 46 U.S.C.App. § 742; *Blanco v. United States,* 775 F.2d 53, 63 n. 8 (2d Cir.1985). The governing law in a case brought under the SAA is federal maritime law, which incorporates the traditional elements of a negligence cause of action. *See Sutton v. Earles,* 26 F.3d 903, 911–12 (9th Cir.1994); *Queen of Hearts Cruises, Inc. v. United States,* Nos. 96 Civ. 6712, 98 Civ. 0111, 1999 WL 195298, at *6 (S.D.N.Y. Apr.7, 1999).

In particular, federal courts have applied the Good Samaritan doctrine as set forth in the Restatement (Second) of the Torts as part of maritime tort law. *See, e.g., Kurowsky,* 660 F.Supp. at 450 (citing cases); *Good v. Ohio Edison Co.,* 149 F.3d 413, 420 (6th Cir.1998); *Cassens v. St. Louis River Cruise Lines, Inc.,* 44 F.3d 508, 510 n. 2 (7th Cir.1995); *Patentas v. United States,* 687 F.2d 707, 714 (3d Cir. 1982). The relevant provisions of the Re-

statement, Sections 323 and 324A, provide as follows:

### § 323. NEGLIGENT PERFORMANCE OF UNDERTAKING TO RENDER SERVICES

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or his things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

### § 324A. LIABILITY TO THIRD PERSON FOR NEGLIGENT PERFORMANCE OF UNDERTAKING

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Restatement (Second) of Torts* §§ 323, 324A (1965).

 In this case, the Good Samaritan doctrine does not apply because, as previously discussed, there is simply no evidence that Officer Puma ever undertook to protect others by agreeing to guard the gangway. Further, even assuming *arguendo* that Officer Puma did agree to guard the gangway, the United States

could still not be held liable. In order to prevail on a claim based on either Section 323 or Section 324A, plaintiffs would also have to be able to show that Officer Puma's action proximately caused Anthony Matthews' injuries, either because: (1) his actions increased the risk of harm to Matthews; (2) he agreed to perform a duty owed by another, such as KMS, to Matthews; or (3) Matthews suffered harm because of his reliance on Officer Puma's actions. Plaintiffs are unable to make such a showing.

First, plaintiffs cannot show that "the Coast Guard through affirmative actions caused 'some physical change to the environment or some other material alteration of circumstances'" that increased the risk of harm to Matthews. *Good*, 149 F.3d at 421 (quoting *Patentas*, 687 F.2d at 717). Even if Officer Puma could be considered negligent in failing to warn Matthews that the barge's holding tanks were uncovered, he took no affirmative actions to make it more likely that Matthews would fall in the tank. *See Patentas*, 687 F.2d at 716 (plaintiff must "identify sins of commission rather than omission"). "The test is not whether the risk was increased over what it would have been if the defendant had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all." *Myers v. United States*, 17 F.3d 890, 903 (6th Cir.1994). Here, the danger to Matthews posed by the open holding tank would have been the same whether Officer Puma had negligently warned Matthews of the danger or had never undertaken to warn Matthews at all.

Second, plaintiffs cannot show that Officer Puma, even if he was standing guard at the gangway, agreed to perform KMS' contractual duty under the BOA to ensure safety on the Nathan Berman. KMS's foreman, Loucka, the only person who claims to have seen where Officer Puma was standing after Claudio's accident, never spoke to Officer Puma. Further, he testified at his deposition as follows:

Q: Why didn't you station somebody at the head of the gangway to make sure no one got on the barge?

A: I probably don't recall—I don't recall if there were other personnel other than Mr. Puma on there, and I didn't tell him to stay there. My function was to get down there to do that very thing, get people up there to set up some security. I couldn't have Ray [Schoentube] abandon the people that were in the tank and I had to get to the pier. So there wasn't anybody else at that time.

. . .

Q: Did you go down to [the pier] to make sure the phone calls were being made? Was that your primary purpose in going down?

A: That, and to get some additional personnel up there to assist. At that time I didn't know the extent of [Claudio's] injuries, and whether or not we would be able to perform any kind of rescue on our own. Just to get other people up there to provide some kind of safety and security type of thing.

(Loucka Dep. at 50–52.) Even accepting Loucka's version of events, plaintiffs cannot reasonably argue that Officer Puma had agreed to assume any duty from KMS. No KMS employee ever spoke with Officer Puma, and indeed, Loucka believed that it was his responsibility to "get people up [to the barge] to set up some security." (Loucka Dep. at 50–51.)

Third, plaintiffs are unable to show any "actual, detrimental reliance" by Anthony Matthews on Officer Puma's actions under Section 324A(c). *Good*, 149 F.3d at 421. There is no evidence that Matthews was

even aware that the Officer Puma was going to be present on board the barge on October 1, 1993, let alone that Matthews knew Officer Puma was there to ensure his safety. *See Patentas*, 687 F.2d at 717 (no detrimental reliance when plaintiff has no knowledge of Coast Guard's actions). Moreover, even assuming that Matthews believed Puma would be on the barge to warn him of him any dangers, plaintiffs cannot show that Matthews, or KMS for that matter, were induced "to forgo other remedies or precautions against the risk." *Myers*, 17 F.3d at 903 (quoting Restatement (Second) of Torts § 324A cmt. e.) To the contrary, as noted, Loucka intended to set up security on the barge, and Matthews was, at the very least, told by KMS' Site Safety Officer Nugent that Claudio had fallen into a tank on the barge and by Loucka to "[s]tand by, we have an emergency situation." (Deposition of Anthony Matthews ("Matthews Dep.") at 26–27, 29.)[6] Under any theory of proximate cause, therefore, plaintiffs would be unable to establish that the government was negligent under Section 323 or 324A of the Restatement based on the undisputed facts.

The KMS defendants further object to the R & R because it does not address the government's liability to them under the Good Samaritan Doctrine. (KMS Defs.' Objections at 5, ¶ D & 8–9.) The KMS defendants' interpretation of Section 324A is misguided. Section 324A plainly relates to the liability of a party to a *third person* who suffers physical harm; in other words, the United States' liability to the plaintiff, Anthony Matthews. The Good Samaritan doctrine simply has no application to the duties, if any, that the government owes its co-defendants. Since the Court concludes that the government is not liable to plaintiffs under a Good Samaritan theory, it would be nonsensical to hold it liable to KMS thereunder.

## IV. *Indemnification and Contribution*

Finally, the KMS defendants object to the R & R's conclusion that they have no right to either indemnification or contribution from third-party defendant Independent Testing. The Court concurs that Independent Testing's motion for summary judgment should be granted, but as the Court's reasoning differs somewhat from that of the R & R, a more thorough discussion is necessary.

### A. *Indemnification*

KMS argues that it is entitled to seek indemnification from Independent Testing under the doctrine announced by the Supreme Court in *Ryan Stevedoring Co. v. Pan–Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). In reviewing the long and tortured history of the so-called *Ryan* indemnity, the Court concludes that there is no basis for an indemnification claim against Independent Testing in this case.

---

**6.** The parties genuinely dispute whether Officer Puma warned Matthews about the open holding tank. Matthews testified that Officer Puma did not say anything to him as he was boarding the barge. (Matthews Dep. at 30.) Puma testified that he told Matthews, "[D]on't go on the barge. We've had an accident." (Puma Dep. at 32.) Although the R & R, at 27–28, adopts Puma's version of events, it does so merely for the sake of argument, to show that plaintiffs could not rest on such warning to establish detrimental reliance. After all, even if Puma's warning was insufficient to warn Matthews of the open holding tank, it was certainly sufficient to warn Matthews not to board the barge in the first place. In any case, the R & R does not purport to resolve one or way or another whether Puma, in fact, ever warned Matthews not to board the barge, nor does the Court believe it necessary to resolve this question in deciding the instant motions.

Knowledge of the context in which *Ryan* was decided is crucial to understanding its holding. In *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Supreme Court held that a shipowner could be held strictly liable to longshoremen employed by an independent stevedoring contractor for injuries caused by dangerous conditions on board the ship, even if those conditions were created by the contractor's actions. A few years later, in *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), the Supreme Court ruled that the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. § 903 *et seq.,* which limited an employer's liability with respect to its injured employees, precluded a claim for contribution by a shipowner held strictly liable to an injured plaintiff under *Seas Shipping* against the plaintiff's employing stevedore.

The Supreme Court precedent before *Ryan* therefore made it possible for a shipowner to be held strictly liable for injuries suffered by a longshoreman and unable to recover any contribution from that longshoreman's employer, even if that employing stevedore's negligence was the cause of the employee's injuries. The Court, attempting to fashion a rule under which the stevedores could be held accountable for their actions, thus held in *Ryan* that the LHWCA did not bar contract-based suits against an employing stevedore for indemnification (as distinct from the tort-based contribution theory addressed in *Halcyon,* which the Court did not overrule), and implied into every shipowner-stevedore contract a warranty of workmanlike service giving rise to a claim for indemnification. *Ryan,* 350 U.S. at 131–34, 76 S.Ct. 232.

In 1972, Congress amended the LHWCA, "radically chang[ing] this scheme of things." *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 165, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). The amendments abolished both the injured plaintiff's right to recover against a shipowner on a strict liability theory and the stevedore's corresponding obligation to indemnify the shipowner. *See id.* The precise holding in *Ryan,* that a shipowner held strictly liable under *Seas Shipping* may seek indemnification from the injured plaintiff's employing stevedore, has therefore been overruled. *See Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 113 n. 6, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974); *Fairmont Shipping Corp. v. Chevron Int'l Oil Co.,* 511 F.2d 1252, 1258 n. 8 (2d Cir.1975).

The question before the Court in this case is whether *Ryan* indemnity retains its vitality outside the context in which it was decided. Here, a government contractor hired to conduct a hazardous waste clean-up on the Nathan Berman is seeking indemnification from its subcontractor whose employee suffered injuries. The Magistrate Judge concluded that although *Ryan* indemnity did not apply *per se,* KMS might nevertheless be entitled to indemnification based on a breach of the implied warranty of workmanlike performance. Although the Court concurs that a warranty of workmanlike performance is implied in all maritime service contracts, see *Fairmont,* 511 F.2d at 1259, it disagrees with the Magistrate Judge's conclusion that the existence of such warranty automatically gives rise to indemnification.

The Magistrate Judge appears to posit that there are actually two types of implied indemnification, so-called *Ryan* indemnification, which is based on the warranty of workmanlike performance but requires that the party seeking indemnification from a third party be strictly liable to the injured plaintiff, and some other

type of indemnification, based solely on the warranty of workmanlike performance. That is incorrect. As *Fairmont* explains, every maritime service contract contains a warranty of workmanlike performance, but that warranty only gives rise to an implied right to indemnification in some instances.[7] The *Ryan* case articulates one set of circumstances under which indemnification would be implied.

If the Magistrate Judge's conclusion was correct, then every maritime contract would necessarily also include an implied right to indemnification. That would extend *Ryan* indemnity beyond all reasonable bounds. As discussed in *Fairmont,* 511 F.2d at 1258,[8] and more recently in *Lubrano v. Waterman Steamship Co.,* 175 F.3d 274 (2d Cir.1999) (Calabresi, J.), the circumstances in which the warranty of workmanlike performance gives rise to an implied right to indemnification are extremely limited. In *Lubrano,* the Second Circuit reconciled its prior decisions interpreting *Ryan* and concluded that:

> *Ryan* indemnification was a judicially-created doctrine ... that implied a term of indemnification into the shipowner-stevedore contract as a reasonable approximation of the parties' intent within

a particular context—a context (1) in which a contractor's defective performance could expose the shipowner to liability for injuries caused by that defective performance regardless of whether the shipowner was at fault for the injury, and (2) in which noncontractual loss allocation mechanism—like contribution—were unavailable.

175 F.3d at 283. The *Lubrano* Court then concluded that because of changes to the legal context of the shipowner-stevedore relationship since *Ryan* was decided, "in the absence of an express indemnification clause to the contrary, the contract between a shipowner and a non-employing stevedore does not obligate the stevedore to indemnify the shipowner for the shipowner's liability to an injured longshoreman." *Id.*

The Court thus concludes in this case that even if the contract between KMS and Independent Testing contained a warranty of workmanlike performance, there is no implied right to indemnification. As the parties apparently agree that Independent Testing is not a covered employer under the LHWCA,[9] the Court believes that *Lubrano* is controlling.[10] Since the parties do

---

7. The Second Circuit has made plain that the two concepts—the implied warranty of workmanlike performance and indemnification—are separate principles that should not be conflated. In *Fairmont,* the court stated: "[T]he factors to be considered in determining whether a contract includes a warranty of workmanlike performance are entirely separate from the factors that go into the determination of whether that warranty encompasses an obligation to indemnify." *Id.*

8. The *Fairmont* court explained that an implied right to indemnification, based on a breach of the warranty of workmanlike performance, arises when:

[1] A shipowner, relying on the expertise of another party (the contractor), enters into a contract whereby the contractor agrees to perform services without supervi-

sion or control by the shipowner; [2] the improper, unsafe, or incompetent execution of such services would foreseeably render the vessel unseaworthy or bring into play a preexisting unseaworthy condition; and [3] the shipowner would thereby be exposed to liability regardless of fault.

511 F.2d at 1258.

9. Neither the KMS defendants nor Independent Testing object to the R & R's conclusion that the provisions of the LHWCA do not apply to limit suits against Independent Testing because it failed to "secure payment of compensation as required" by the LHWCA. 33 U.S.C. § 905(a).

10. While *Lubrano* discusses an indemnification suit between a shipowner and a non-employing stevedore, there is no reason to

not dispute that there was no express indemnification agreement between them, the Court, relying on *Lubrano,* declines to imply such an agreement into their relationship.

This conclusion is further supported by the absence here of the special circumstances the Second Circuit noted is necessary for *Ryan* indemnity to apply, strict liability combined with the unavailability of contribution. KMS' liability to plaintiff Anthony Matthews under Sections 200, 240, and 241 of New York Labor Law is not currently before the Court, and the Court declines to decide at this time whether federal maritime law would preempt at least the strict liability cause of action under Labor Law § 240(1). *Compare Gravatt v. City of New York,* No. 97 Civ. 0354, 1998 WL 171491, at *14 (S.D.N.Y. Apr. 10, 1998) (federal admiralty law does not preempt § 240(1)) and *Cammon v. City of New York,* 260 A.D.2d 70, 74, 700 N.Y.S.2d 110, 113 (1st Dep't 1999) (same), with *Sutherland v. City of New York,* 266 A.D.2d 373, 379–80, 699 N.Y.S.2d 426, 432 (2d Dep't 1999) (federal admiralty law preempts § 240(1)) and *Eriksen v. Long Island Lighting Co.,* 236 A.D.2d 439, 440, 653 N.Y.S.2d 670, 671 (2d Dep't 1997) (same).

■ Regardless of whether KMS might possibly be held strictly liable to plaintiff Anthony Matthews under some state law theory, however, a claim for contribution is available here. Although KMS is not entitled to contribution from Independent Testing for other reasons, which

are discussed below, the LHWCA does not preclude KMS' claim for contribution in this case because it is conceded that Independent Testing is not a covered employer under the statute.[11] In *Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* the Supreme Court expressly limited *Halcyon,* and held that a shipowner could seek contribution from a non-employing stevedore whose negligence caused plaintiff's injuries. 417 U.S. at 113, 94 S.Ct. 2174. Since contribution would thus be available to KMS if it could show that Independent Testing was a joint tortfeasor, there is no reason to imply an indemnification agreement into an otherwise standard contractor-subcontractor relationship. Had the parties intended for Independent Testing to indemnify KMS, they could have entered into a contract to that effect.

The Court notes that, in any event, for the reasons discussed in the Report and Recommendation, it agrees with the Magistrate Judge's conclusion that KMS cannot establish that Independent Testing breached its warranty of workmanlike performance. The warranty of workmanlike performance provides that a party "who contracts to provide services impliedly agrees to perform in a diligent and workmanlike manner." *Fairmont,* 511 F.2d at 1259. Although KMS argues that the Magistrate Judge improperly determined that Matthews had not yet begun to perform any services when the accident occurred, it is unable to show that such fact is genuinely disputed. To the contrary, KMS admits that Matthews was hired to "inspect and conduct atmospheric tests in-

believe that its holding does not similarly apply to an indemnification suit between a marine contractor and a non-employing (at least for the purposes of the LHWCA) subcontractor. Indeed, KMS' claim for indemnification rests on the very premise that *Ryan* indemnity applies to maritime contracts other than ones solely involving a shipowner and a stevedore.

**11.** If Independent Testing were a covered employer under the LHWCA, KMS would not have any right to contribution from Independent Testing, as the LHWCA would provides the exclusive remedy against it. *See* 33 U.S.C. § 905(a); *Triguero v. Consolidated Rail Corp.,* 932 F.2d 95, 98–99 (2d Cir.1991).

side various hatches or tanks on board the barge Nathan Berman." (Affidavit of Joseph E. Donat in Opposition to Motion, sworn to June 5, 1997, at ¶ 2.) There is no dispute that at the time he was injured, Matthews was not yet inspecting the barge's tanks or conducting any tests—he was simply walking across the deck of the barge. Given such circumstances, the Magistrate Judge properly reasoned that Matthews had not performed his services incompetently, because he had not yet performed any services at all when he was injured. Accordingly, even if the Court were to find that a breach of the warranty of workmanlike performance always gives rise to a right to indemnification, KMS would still not be able to obtain indemnification here.

B. *Contribution*

Although KMS' claim for contribution is not precluded by the LHWCA as a matter of law, its claim fails on other grounds. Contribution is typically available to a party "when two or more persons are liable to the same plaintiff for the same injury and one of the joint tortfeasors has paid more than his fair share of the common liability." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 204 (2d Cir.1987) (quoting *Northwest Airlines, Inc. v. Transport Workers Union of Am.*, 451 U.S. 77, 87–88, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)). In this case, KMS can make no showing that it is entitled to any contribution from Independent Testing.

To the extent that KMS argues that Anthony Matthews' own negligence should be imputed to his employer, Independent Testing, and that KMS should therefore be allowed to seek contribution from Independent Testing,[12] such claim fails under *Red Star Towing & Transp. Co., Inc. v. Cargo Ship "Ming Giant"*, 563 F.Supp. 224, 226 (S.D.N.Y.1983) (Leval, J.), which this Court finds persuasive. In *Red Star*, plaintiff Lorraine Mowen brought an action for her husband's death, caused by injuries allegedly resulting from the negligence of defendants Yangming Marine Transport Corporation ("Yangming") and her husband's employer, Red Star Towing & Transportation Company ("Red Star"). After a jury found Yangming was 60% responsible for Dennis Mowen's death, Red Star was 35% responsible, and Dennis Mowen was 5% responsible for his own death,[13] Yangming sought additional contribution from Red Star to the extent that Dennis Mowen was responsible for the accident. Judge Leval ruled that Yangming had no right to contribution under the circumstances because "Yangming will receive full credit for [Dennis Mowen's] negligence through reduction of the liability by the percentage attributable to his fault." *Red Star*, 563 F.Supp. at 226.

Applying the same reasoning, KMS should likewise not be entitled to contribution from Independent Testing for Anthony Matthews' injuries if the only negligence attributable to Independent Testing is Matthews' contributory negligence. To permit otherwise would result in the un-

12. Although KMS argues in its objections that it is *"not* seeking contribution from Independent Testing for any negligence attributable to Mr. Matthews," its papers, which are not a model of clarity, suggest otherwise. (KMS Defs.' Objections at 11 (emphasis in original).) Although KMS's Third Party Complaint does not state any facts supporting its contention that Independent Testing was negligent, its Affidavit in Opposition to Independent Testing's motion for summary judgment largely relies on allegations regarding Matthews' failure to heed warnings not to board the barge and his failure to exercise sufficient caution. As a result, KMS' contention that it is not relying on Matthews' negligence is more than slightly disingenuous.

13. *See Red Star Towing & Transp. Co., Inc. v. "Ming Giant"*, 552 F.Supp. 367, 369 (S.D.N.Y.1982).

just result of KMS' share of liability being twice reduced by the percentage of fault attributed to Matthews for his own injuries. To allow KMS "an additional right to contribution from [Independent Testing] for the percentage attributable to [Matthews'] negligence would be double counting." *Id.* (citing *Shiver v. Burnside Terminal Co.,* 392 F.Supp. 1078 (E.D.La. 1975)); *see also Stissi v. Interstate and Ocean Transp. Co.,* 765 F.2d 370, 377 (2d Cir.1985) (citing *Red Star* and *Shiver* with approval).

Although *Red Star* does not rule out the possibility that a party could seek contribution from an injured plaintiff's employer if that employer were independently negligent, for instance if the employer's other employees acted negligently, KMS cannot make such a showing in this case. KMS appears to argue that Independent Testing was itself negligent both in hiring Matthews, because he had a scarred cornea in his right eye, and in supervising Matthews, because he was not given any safety manuals relating to his work on the Nathan Berman, and that such negligence contributed to Matthews' injury. As a matter of law, KMS does not have a right to contribution from Independent Testing for such claims of negligent hiring and supervision.

A tortfeasor may only seek contribution "from other joint tortfeasors whose negligence contributed to the injury and who are also liable to the plaintiff." *Zapico v. Bucyrus–Erie Co.,* 579 F.2d 714, 718 (2d Cir.1978). Since Independent Testing could not be liable to its employee Matthews on a claim for negligent hiring, KMS has no right to contribution from Independent Testing. *See Camarda v. Summit Homes,* 233 A.D.2d 285, 286, 649 N.Y.S.2d 463, 464 (2d Dep't 1996) (dismissing third-party complaint); *Vincenzino v. Calvosa,*

151 Misc.2d 95, 98, 572 N.Y.S.2d 611, 613 (Sup.Ct.1991) (dismissing third-party complaint and stating that as an employer's "breach of duty not to negligently hire its employees cannot be actionable by the employee himself," defendant and third-party plaintiff had no right to contribution from "the allegedly negligently employer who hired plaintiff.").[14] Further, since Matthews "was engaged in the common and ordinary activity" of walking across the deck of a ship at the time he was injured, Independent Testing cannot be liable for negligently training, instructing or supervising him in the performance of that activity. *Camarda,* 233 A.D.2d at 286, 649 N.Y.S.2d at 464; *Lattanzi v. International Bus. Machs. Corp.,* 237 A.D.2d 259, 260, 655 N.Y.S.2d 398, 399 (2d Dep't 1997) (dismissing contribution claims because employer had no duty to provide plaintiff employee "with instructions, warnings, or assistance on the performance of tasks which are ordinary and within the ken of the average person").

In sum, despite the availability of a contribution claim in this case, KMS cannot show any actionable negligence on Independent Testing's part that would allow for any recovery.

### Conclusion

For the foregoing reasons, the Court adopts the R & R as the opinion of the Court, except to the extent clarified herein. The motions by defendant United States and third-party defendant Independent Testing for summary judgment are granted.

SO ORDERED.

---

**14.** In the absence of any established rules of general maritime law on this issue, the Court will rely on state tort law principles. *See Earl*

*v. Bouchard Transp. Co.,* 735 F.Supp. 1167, 1170–71 (E.D.N.Y.1990) (Weinstein, J.).